UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| NUTRITION DISTRIBUTION, LLC,<br>Plaintiff,<br>v.<br>BTE WHOLESALERS, LLC, d/b/a "TOKKYO NUTRITION,"<br>-and-<br>KEITH M. OMERSO,<br>Defendants. | } | Civil No. |

**COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiff, Nutrition Distribution, LLC, by and through its undersigned attorney, Mark W. Dell'Orfano, pllc, complains against Defendants and alleges the following:

INTRODUCTION

1. BTE Wholesalers, LLC ("BTE"), under its registered trade name "Tokkyo Nutrition," is a self-described wholesaler and retailer of nutritional products, advertises on its website that it "carries the most diverse and effective line of supplements and prohormones on the market; merging the most advanced research and technology from East and West."

2. In reality, BTE is exposing its customers to extreme health risks through its false and misleading advertising regarding certain products (collectively, the "Prohormone Products") containing anabolic-androgenic steroid chemicals such as, without limitation, Dimethazine (also known as "DMZ" and "Dymethazine").

3. Published, peer-reviewed clinical studies have repeatedly shown prolonged consumption of Dimethazine to expose humans to extreme health risks including, without limitation, hepatotoxicity (i.e., liver damage), cholestasis (i.e., bile blockage), acute renal failure, hypogonadism (i.e., decreased function or failure of sexual organs), gynecomastia (i.e., development of breasts in men), and infertility.

4. Despite these severe health risks, Defendants market their various Prohormone Products as “prohormone” performance enhancers to body builders, gym users, fitness enthusiasts, and athletes, promising these consumers numerous purported physical benefits without mentioning, and in some cases expressly denying, the overwhelming clinical evidence that such products pose extreme health risks.

5. These severe health risks that have led the Federal government to classify most anabolic-androgenic steroids, including Dimethazine, as “controlled substances” under the Controlled Substances Act (21 U.S.C. § 801 *et seq*.) (the “CSA”), thereby criminalizing the manufacture, distribution, and dispensation of such chemicals.

6. In addition, many national and international sports agencies have expressly banned Dimethazine from competition.

7. Although Defendants know, or should know, that their Prohormone Products are dangerous, illegal, and banned by sports agencies, Defendants' marketing and advertising with respect to such products suggests the exact opposite. Accordingly, Defendants have knowingly and materially participated in a false and misleading advertising campaign to promote and sell their Prohormone Products. Defendants' continued false, misleading, illegal, and deceptive practices have violated the Lanham Act and have unjustly enriched Defendants at the expense of Plaintiff, a legitimate sport supplement manufacturer, and have caused Plaintiff extensive and

irreparable harm, including, without limitation, loss of revenue, disparagement, and loss of goodwill.

8. Among other things, this action seeks to enjoin Defendants from the manufacture, marketing, and sale of all products containing any anabolic-androgenic steroids, including without limitation, Dimethazine, as Defendants are illegally and falsely marketing such products in violation of the Lanham Act.

## THE PARTIES

9. Plaintiff, Nutrition Distribution, LLC, is an Arizona limited liability company, with its principal place of business located at 2245 W. University, Ste 5, Tempe, Arizona, 85281.

10. Defendant BTE Wholesalers, LLC d/b/a "Tokkyo Nutrition" ("BTE") is a New Hampshire limited liability company, with its principal place of business located at 587 Second Street, Suite B, Manchester, New Hampshire, 03102.

11. Defendant Keith M. Omerso ("Omerso") is a resident of the State of New Hampshire, with a home address of 4 Stonewall Way, Unit A, Exeter, New Hampshire, 03833.

## JURISDICTION AND VENUE

*SUBJECT MATTER JURISDICTION*.

12. This Honorable Court has the requisite subject matter jurisdiction to hear and to consider Plaintiff's claims and prayers for relief, based on its federal question jurisdiction, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331, because Plaintiff asserts causes of action arising under Federal law.

13. This Honorable Court has the requisite subject matter jurisdiction to hear and to consider Plaintiff's claims and prayers for relief, based on its diversity of citizenship jurisdiction, pursuant

to 28 U.S.C. § 1332, because: (a) no plaintiff and no defendant are citizens of the same state; and (b) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14. In support of Plaintiff's basis for the exercise of this Court's diversity of citizenship jurisdiction, Plaintiff further states that it is an Arizona limited liability company with two (2) members. The first member being Alan Investment Co., Inc. ("Alan"), a California corporation (dissolved), with its principal place of business in California. Alan's sole shareholder is Michael Keplinger, a natural person and a resident of Idaho. The second member being Liberty Mutual Holdings, Inc. ("Liberty"), a Utah corporation (dissolved), with its principal place of business in Utah. Liberty's sole shareholder is Kevin Smith, a natural person and a resident of Texas. The Defendant BTE, upon reasonable knowledge and belief, and as of the date of this complaint, has a single member, Omerso, who is a natural person and a resident of the State of New Hampshire. Lastly, as previously averred, Defendant Omerso is, upon reasonable knowledge and belief, a resident of Exeter, New Hampshire.

*PERSONAL JURISDICTION*.

15. This Honorable Court may exercise its personal jurisdiction over BTE as it is a New Hampshire limited liability company, headquartered in Manchester, New Hampshire.

16. BTE operates a retail point of sale to the public for its nutritional supplement products, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, from its store front location at 587 Second Street, Manchester, New Hampshire.

17. BTE, directly or through its intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold, and advertised its nutritional supplement products in the United States, in the State of New Hampshire, and in this

judicial district, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids.

18. Lastly, BTE has purposefully and voluntarily placed its nutritional supplement products, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, into the stream of commerce with the expectation that they will be purchased, and, in some cases, used by unwitting consumers, in this judicial district.

19. This Honorable Court may exercise its personal jurisdiction over Omerso as he is a natural person, who, based on reasonable knowledge and belief, maintains his principal residence in this judicial district; to-wit, Exeter, New Hampshire.

20. Omerso, through BTE, operates a retail point of sale to the public for his nutritional supplement products, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, from BTE's store front location at 587 Second Street, Manchester, New Hampshire

21. Furthermore, Omerso has, directly, through BTE, or through his or BTE's intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold, and advertised its nutritional supplement products in the United States, in the State of New Hampshire, and in this judicial district, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids.

22. Lastly, Omerso has purposefully and voluntarily placed nutritional supplement products, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, into the stream of commerce with the expectation that they will be purchased, and, in many cases, consumed by unwitting consumers in this judicial district.

*VENUE*.

23. This Honorable Court is the appropriate venue to hear and to consider Plaintiff's claims, pursuant to 28 U.S.C. § 1391(b)(1) and pursuant to 28 U.S.C. § 1391(b)(2).

24. Defendant BTE is a New Hampshire limited liability company, with its principal place of business in this judicial district, which, pursuant to applicable New Hampshire law, may sue or be sued in its own name within this judicial district.

25. Furthermore substantially all of Defendant BTE's purposefully and voluntarily acts of developing, licensing, manufacturing, shipping, distributing, offering for sale, selling, and advertising of its nutritional supplement products in the United States and in the State of New Hampshire, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, whether directly or through its intermediaries (including distributors, retailers, and others), which gave rise to Plaintiff's claims, originated from and occurred in this judicial district

26. Defendant Omerso is natural person residing within this judicial district.

27. Furthermore, substantially all of Defendant Omerso's purposefully and voluntarily acts of developing, licensing, manufacturing, shipping, distributing, offering for sale, selling, and advertising nutritional supplement products in the United States and in the State of New Hampshire, including, but not limited to, the Prohormone Products and other products containing anabolic-androgenic steroids, whether directly, through BTE, or through his intermediaries (including distributors, retailers, and others), which gave rise to Plaintiff's claims, originated from and occurred in this judicial district.

## FACTUAL ALLEGATIONS

28. The nutritional supplement industry is one of the fastest growing and most lucrative in the United States. A recent Forbes article estimates that nutritional supplement sales accounted

for $32 billion in revenue in 2012 and predicts this number to grow to $60 billion within ten years. The growth and size of the nutritional supplement market and the relatively low barriers to entry provide perverse incentives for unfair competition prohibited by the Lanham Act and by New Hampshire's Consumer Protection Act, and for other illegal activity.

*PLAINTIFF & ITS PRODUCT "MASS FX BLACK*."

29. Plaintiff is a cutting-edge sports supplement manufacturer and marketer. From its inception, Plaintiff was a leader in the nutritional supplement market, specifically for bodybuilding.

30. Plaintiff has offerings in several categories of body building products, including pre-workouts formulas, weight and muscle-gainers, fat burners, and other nutritional performance enhancement products.

31. Plaintiff has invested substantial time and capital in the research and development of Mass FX Black, one of Plaintiff's products in the muscle-gainer sub-market. Specifically, Plaintiff designed and markets Mass FX Black to provide consumers more aerobic power, greater muscular endurance, and faster recovery. Defendants claim that consumption of the Prohormone Products results in these very same benefits.

*DIMETHAZINE AND PROHORMONES*.

32. Products containing chemicals described as "prohormones" are, like Mass FX Black, marketed to fitness enthusiasts and bodybuilders as muscle-gainers and athletic performance enhancers.

33. However, the vast majority of products described as "prohormones" in the health and fitness marketplace, including Dimethazine, have very similar physiological effects in the human body to anabolic-androgenic steroids once ingested. Such "prohormones" are often touted by

fitness supplement manufactures and retailers as providing the same physical benefits as anabolic-androgenic steroids, but without the dangerous side effects known to be associated with such chemicals.

34. However, published, peer-reviewed clinical studies have repeatedly shown such mislabeled "prohormones" to be unsafe for human consumption. For example, medical experts have found consumption of Dimethazine to cause hepatotoxicity (i.e., liver damage), cholestasis (i.e., bile blockage), acute renal failure, hypogonadism (i.e., decreased function or failure of sexual organs), gynecomastia (i.e., development of breasts in men), and infertility. While some of these conditions may be reversible in cases of short-term consumption, more aggressive use has been shown to result in permanent organ damage. Thus, although even modest consumption of Dimethazine poses serious health risks, these risks are often greatly amplified in individuals who, because they are misled as to the side effects of such substances and do not benefit from the advice of experts, consume Dimethazine for an extended period and/or in significant amounts.

35. It is these severe health risks that have led the Federal government to classify most of the chemicals sold as "prohormones," including Dimethazine, as "controlled substances" under the CSA, thereby criminalizing the manufacture, distribution and dispensation of such chemicals. Under Section 841 of the CSA, it is illegal (except as otherwise specifically authorized) for any person to knowingly manufacture, distribute or dispense, or possess with intent to manufacture, distribute or dispense, a "controlled substance." The CSA's definition of "controlled substance" includes both those anabolic steroids specifically scheduled pursuant to the CSA and those steroids that, even if not specifically set forth in the CSA's definition of "anabolic steroid," (i) are derived from, or have a chemical structure substantially similar to, a chemical otherwise qualifying as an "anabolic steroid" under the CSA, and (ii) have been created or manufactured

with the intent of promoting muscle growth or otherwise having pharmacological effects similar to those of testosterone and/or have been marketed so as to suggest that such chemicals may have such effects. (See Section 802(41)(C) of the CSA.)

36. Dimethazine is nothing more than two bound Methasterone (a.k.a. "Superdrol") molecules which separate upon human ingestion, and accordingly, it is a "controlled substance" under the Act because it is (a) derived from, and structurally similar to, Methasterone, a chemical already set forth as a Schedule III controlled anabolic steroid under the CSA, and (b) often touted by sellers (including by BTE) as promoting muscle growth.

37. Accordingly, under Section 841 of the CSA, the manufacture, distribution and dispensation, and the possession with intent to manufacture, distribute or dispense, of Dimethazine is illegal.[1]

38. In addition, many national and international sports agencies, including without limitation, the World Natural Body Building Federation and the North American Natural Body Building Federation, have expressly banned Dimethazine from competition. Moreover, because Dimethazine converts to Methasterone when ingested, consuming Dimethazine will lead to disqualification from any competition using the World Anti-Doping Agency's standards.

*DEFENDANTS AND THEIR PROHORMONE PRODUCTS*.

39. BTE is a nutritional supplement company based in New Hampshire, which, along with Omerso, directly compete with Plaintiff in the fitness supplement marketplace.

[1] While the U.S. Food and Drug Administration may have primary jurisdiction regarding the legality of the sale of certain dietary ingredients or food additives, whether or not the sale of steroid chemicals such as Dimethazine and Methasterone is legal is unambiguously the purview of the CSA and the Attorney General of the United States. As a result of the Attorney General causing Methasterone to be scheduled as a controlled substance, Dimethazine likewise became a controlled substance under the catchall language of Section 802(41)(C) of the CSA.

40. Defendants manufacture, distribute and sell the Prohormone Products through the website, tokkyonutrition.com, and various other on-line retail marketplaces (collectively, the "Websites").

41. On its Websites and through various other promotional materials, BTE touts the numerous purported health and physical benefits of its Prohormone Products. For example, and without limitation, Defendants represent on their Website that its Dimethazine product will cause "strength gains to go up after a few days" and will lead to a "serious increase in strength." Generally, Defendants specifically market their various Prohormone Products as "dietary supplements" to body builders, gym users, fitness enthusiasts and athletes, promising these consumers many of the purported fitness benefits of anabolic-androgenic steroids without mentioning, and in some cases expressly denying, that these chemicals pose serious health dangers, are illegal and have been banned by many national and international sports agencies.

42. This false and disingenuous marketing of their Prohormone Products gives consumers a false sense of security regarding the safety of the Prohormone Products. In reality, BTE and its executives have known all along about the dangers associated with their Prohormone Products and Dimethazine, generally.

43. Defendants' false advertising is harmful to the marketplace for dietary and nutritional supplements, as well as to the health of individual consumers.

44. Defendants have created a marketplace of misled and disillusioned young athletes, bodybuilders, and recreational weight-lifters, who have been led to believe by Defendants' false advertising, that they must strive to gain muscle, at all costs, by consuming Defendants' Prohormone Products. Tragically, these young athletes are ignorant of, and intentionally misinformed about, the health dangers of consuming Defendants' Prohormone Products.

45. Users of such products, who have been misled by Defendants' claims that Prohormone Products are a quick and safe way to gain muscle, have little incentive to use a natural product like Mass FX Black until they are injured by Prohormone Products, or until Prohormone Products are taken off the shelves by government action.

COUNT I.
False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act.

46. Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

47. Defendants have purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its Prohormone Products by, without limitation, commercially marketing and mislabeling such products without mentioning, and in some cases expressly denying, (i) the overwhelming clinical evidence that such products pose extreme health risks, (ii) the illegality of the manufacture and sale of the Prohormone Products, and (iii) the fact that Dimethazine has been banned by national and international sports agencies.

48. The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers, including those in this district, into believing that they are purchasing a product with different characteristics.

49. This deception is material because (i) it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the health consequences of taking anabolic-androgenic steroids or other "controlled substances," and (ii) such decision could lead to dangerous and unanticipated health consequences for such consumers.

50. Defendants have introduced their false and misleading statements into interstate commerce via marketing and advertising on certain websites and shipment of its products into interstate commerce.

51. Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to BTE and Osmero, and the loss of goodwill in Plaintiff's products. Indeed, Defendants' conduct is a black eye on the industry, as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

52. Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics and qualities of Defendants' products in violation of Section 43(a)(1)(B) of the Lanham Act.

## COUNT II.
## Violations of the New Hampshire Consumer Protection Act.

53. Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

54. Defendants have purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its Prohormone Products by, without limitation, commercially marketing and mislabeling such products without mentioning, and in some cases expressly denying, (i) the overwhelming clinical evidence that such products pose extreme health risks, (ii) the illegality of the manufacture and sale of the Prohormone Products, and (iii) the fact that Dimethazine has been banned by national and international sports agencies.

55. Defendants have introduced their false and misleading statements into New Hampshire commerce via marketing and advertising on certain websites, sale of this products from its retail location in Manchester, New Hampshire, and shipment of its products to New Hampshire consumers.

56. Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of New Hampshire business from Plaintiff to Defendants, and the loss of

goodwill in Plaintiff's products. Indeed, Defendants' conduct has the tendency to disparage Plaintiff's products and goodwill in the New Hampshire marketplace.

57. Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of Defendants' products in violation of the New Hampshire Consumer Protection Act.

PRAYERS FOR RELIEF

A. For preliminary and permanent injunctive relief enjoining Defendants from producing, licensing, marketing and selling any product containing Dimethazine, including, without limitation, the Prohormone Products;

B. For an award of compensatory damages to be proven at trial in accordance with 15 U.S.C. § 1117;

C. For an award of all of Defendants' profits arising from the foregoing acts in accordance with 15 U.S.C. § 1117 and other applicable laws;

D. For restitution of Defendants' ill-gotten gains;

E. For treble damages in accordance with 15 U.S.C. § 1117;

F. For punitive damages;

G. For an award of compensatory damages under R.S.A. 358-A;

H. For treble damages, but no less than double damages, in accordance with R.S.A. 358-A;

I. For court costs, costs of this action, and for reasonable attorneys' fees; and

J. Any other relief this Court may deem just and equitable.

PLAINTIFF RESPECTFULLY DEMANDS TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,

NUTRITION DISTRIBUTION, LLC,
An Arizona limited liability company.

BY ITS ATTORNEY

MARK W. DELL'ORFANO, PLLC

Date: December 5, 2017

/s/ Mark W. Dell'Orfano

Mark W. Dell'Orfano, Esquire
N.H. Bar No. 19962

MARK W. DELL'ORFANO, PLLC
889 Elm Street, 5th Floor
PO Box 531
Manchester, NH 03105-0531
Direct Tel: 603.384.3328
Fax: 603.272.6510
Office: 888.472.3002
E-mail: mark.dellorfano@mwdlaw.net

*Attorney for Nutrition Distribution, LLC*